Smith, J.
(dissenting). In these cases, the constitutionality of the State financing schemes set forth in chapter 190 (Schulz Appeal No. 1) and chapter 220 (Schulz Appeal No. 2) of the Laws of 1990 has been challenged by a group of citizens, appearing pro se (plaintiffs). The State and numerous State officials and agencies are named as defendants. The majority has concluded that plaintiffs have standing to maintain one of *351 these actions "only on a constitutional voter basis” (Schulz Appeal No. 1, majority opn, at 343). Nevertheless, the majority did not reach the merits in either appeal because it concluded that the action in Schulz Appeal No. 1 was barred by laches and that Schulz Appeal No. 2 lacked "a preserved substantial constitutional question” (Schulz Appeal No. 2, majority opn, at 343) and, therefore, warranted dismissal. I concur with the majority to the extent that plaintiffs in Schulz Appeal No. 1 are held to have standing. However, I conclude that substantial constitutional issues have been preserved in Schulz Appeal No. 2 and that, in both Schulz Appeal No. 1 and No. 2, laches should not be a bar to a determination on the merits of these alleged constitutional violations, which are continuing in nature because of their long-term fiscal impact and any continuing authority under the challenged legislation. Therefore, Schulz Appeal No. 1 should be remanded to Supreme Court for a determination on the merits, and Schulz Appeal No. 2 should be remanded to the Appellate Division to address the determination on the merits by Supreme Court. Accordingly, I dissent.
With respect to Schulz Appeal No. 1, various sections of chapter 190 of the State Laws of 1990 (the chapter 190 legislation) permitted the sale and leaseback of Attica Correctional Facility (Attica) and Interstate 287, generating $200 million and $30 million, respectively. This was financed by the issuance of bonds by the Urban Development Corporation and the Thruway Authority. The chapter 190 legislation also authorized the Housing Finance Agency (HFA) to issue up to $500 million in bonds and notes, secured by the State, to fund housing capital program expenditures. As to Schulz Appeal No. 2, chapter 220 of the Laws of 1990 (the chapter 220 legislation) established the New York Local Government Assistance Corporation (LGAC) and authorized it to issue $4.7 billion in bond obligations, payable from State taxes. The challenged statutory provisions in both appeals were not submitted for approval in a voter referendum. Plaintiffs allege that by these actions the State incurred debts in violation of the New York Constitution, article VII, § 11 (voter referendum required to incur State debt); article VII, § 8 (loan of State’s credit to a public benefit corporation prohibited); and article X, § 5 (assumption by State of the obligations of a public benefit corporation prohibited).
The chapter 190 legislation became law on May 25, 1990. The petition challenging that legislation was served upon the *352 Attorney-General on April 29, 1991. According to defendants, the sale and leaseback of Attica was completed on February 1, 1991. Plaintiffs allege that the bonds for this deal were sold on February 26, 1991. The Interstate 287 and HFA bonds were issued in March 1991. Indeed, defendants have alleged that the transactions authorized by this legislation were completed and the proceeds disbursed prior to April 29, 1991. This totaled over $377 million in bonds, with the resulting indebtedness of principal and accruing interest payments. Significantly, although HFA was authorized to issue up to $500 million in bonds and notes (see, §§ 370, 371), only approximately $104 million worth had been issued prior to this litigation and the record does not indicate whether further offerings were made in fiscal year 1991-1992, subsequent to the commencement of this proceeding. Moreover, the 1991-1992 budget was not adopted until July 4, 1991. Thus, when this proceeding was commenced, there was a potential for the incursion of additional debt by the further issuance of HFA bonds and the possibility that the 1991-1992 budget could address any problems created by the litigation. Nevertheless, Supreme Court addressed the issue of laches and found no showing of prejudice to the defendants but did find efforts by the defendants to delay a decision on the merits.[1] Specifically, Supreme Court stated the following:
"In order to invoke the doctrine of latches [sic], a litigant must establish that there has been delay, which is prejudicial to it (See: New York Public Interest Research Group v Levitt, 62 AD2d 1074). In the case at bar, respondents/defendants have not established the requisite prejudice, and as such, the motion to dismiss upon the doctrine of latches [sic] must be denied. Indeed, they still do not appear to be in any hurry to reach a determination on the merits, given the fact that they have sought a further delay of this litigation by failing to join issue in an expeditious fashion.”
The chapter 220 legislation at issue in Schulz Appeal No. 2 became law on June 11, 1990. On or about February 10, 1992, plaintiffs served the petition upon which that appeal is predicated. Prior to the commencement of this proceeding, $2.4 *353 billion in bonds was sold by LGAC — allegedly during the period between February 21, 1991 and December 12, 1991. However, there were pending transactions. Specifically, as indicated by the February 28, 1992 affidavit of Maryanne Gridley, an Assistant Deputy Comptroller for the State, future bond offerings were in jeopardy because of the temporary restraining order obtained by tbe plaintiffs. In addition, the February 27, 1992 affidavit of Patrick J. Búlgaro, Director of the Budget of the State of New York, argued against plaintiffs’ request for injunctive relief to permit "the last $300 million in LGAC bonds” to be sold. Those bonds were issued in March 1992 and the projected aggregate debt service cost for the years 1992 through 2021 is in excess of $6.4 billion. The Búlgaro affidavit also indicates that in fiscal year 1992-1993 or thereafter up to $1 billion in additional proceeds from bond sales was possible because the legislation authorized a total of $4.7 billion ($1.6 billion obtained in fiscal year 1991-1992 and $2.1 billion prior thereto). Despite these facts, Supreme Court concluded that even though only $2.4 billion of the authorized $4.7 billion in bonds had been sold, it would be prejudicial to halt the sale of other bonds.[2] This ruling was in error.
It is clear that at the time that both of these proceedings were commenced, the issue of the constitutionality of the challenged legislation was viable because the authority to incur debt remained. Under such circumstances, the doctrine of laches should not bar a determination on the merits.
Furthermore, the merits of the defense of laches — delay and prejudice to defendants — must be determined within the context of the plaintiffs’ claims. Here, even if defendants’ transactions have been completed, plaintiffs’ allegation of an unconstitutional and continuing wrong of such magnitude that it will extend into the next century must present a greater concern. Since the alleged violations are constitutional and continuing with respect to the accrual of interest on the debt and the possibility of further actions pursuant to the challenged legislation, there is a dual basis for rejecting the laches defense (see, Matter of Burke v Sugarman, 35 NY2d 39, 45 [laches inapplicable because the "failure to comply with constitutional requirements for making appointments of eligibles to competitive positions is a continuing and constitutional wrong”]). Indeed, in rejecting the application of laches to bar *354 challenges to alleged erroneous appointments because of the continuing failure to adhere to the constitutional requirements, this Court has stated that "though made in good faith [these actions] ought to be open to attack by the petitioners, because as citizens and taxpayers they are entitled to an opportunity to insist upon the construction which this court placed upon the * * * State Constitution” (Matter of Cash v Bates, 301 NY 258, 261). As such, the claims herein should not be barred by laches.
In addition, it is difficult to comprehend, upon reading the record in Schulz Appeal No. 2, how the majority can conclude either that the plaintiffs failed to allege voter standing or that no substantial constitutional question has been preserved. First, the plaintiffs asserted voter standing. Specifically, in the amended complaint of February 10, 1992, plaintiffs Schulz, Salvador and Boehm each alleged that he was "a registered voter registered to vote” in a particular town, that he "voted in the last general election,” and that he "is eligible to vote in the next referendum in a general election in New York State.”[3] Second, in the first cause of action, the plaintiffs allege a "violation of Article VII, Section 11 of the State Constitution” (requiring a referendum to incur debts, with certain exceptions). This allegation is repeated throughout the complaint. Defendants clearly understood that voter standing was being alleged. In the affirmation in support of the motion to dismiss, defendants argued, "Since plaintiffs have alleged no injury in fact but only allege their citizen taxpayer and voter status as the basis of standing, they have no standing and the complaint must be dismissed.” Plaintiffs’ supplemental affidavit in opposition to the motion to dismiss addressed the issue of constitutional voter standing by citing New York State Coalition for Criminal Justice v Coughlin (103 AD2d 40, affd 64 NY2d 660) where the Appellate Division did not reach the issue because it was raised for the first time on appeal and was not supported by allegations in the record. Plaintiffs were thus contending that these deficiencies were not present in their case. Indeed, in this case the Appellate Division did reach the issue, albeit unfavorably for plaintiffs (Schulz v State of New York, 185 AD2d 596, 597). Therefore, the issue of voter standing has been before the court since the inception of *355 this litigation (Schulz Appeal No. 2) and the substantive nature of the constitutional contentions is indisputable.
Finally, it must be emphasized that a determination on the merits of these appeals has not been made and none has been suggested. A determination of constitutionality would obviously end the matter, whereas a finding of unconstitutionality would raise the issue of an appropriate remedy. In such a case, the Court is free to consider whether or not such remedy should be purely prospective. What this Court should not do is fail to allow the merits of these constitutional issues to be addressed.
Chief Judge Kaye and Judges Simons, Titone and Hancock, Jr., concur with Judge Bellacosa; Judge Smith dissents in a separate opinion.
In Appeal No. 1: Order affirmed, without costs.
In Appeal No. 2: Appeal dismissed, without costs, upon the ground that no substantial constitutional question is directly involved. Motion for leave to appeal denied.

. The Appellate Division did not address the laches issue in Schulz Appeal No. 1, finding it unnecessary to do so because of its determination that the plaintiffs lacked standing to bring this action.

. In Schulz Appeal No. 2, the Appellate Division did not address the issue of laches, instead deciding the case on the issue of standing.

. In Schulz Appeal No. 1, the plaintiffs, in addition, allege that they "have standing to maintain this action.” Thus, the specific factual allegations as to voter standing are the same in both cases.